**James W. HUTCHINS, Appellant,**

v.

**Sam P. GARRISON, Warden Central Prison; and State of North Carolina, Appellees.**

**No. 83–6642.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1983.

Decided Dec. 29, 1983.

Certiorari and Stay Denied Jan. 11, 1984. See 104 S.Ct. 750.

Roger W. Smith, Raleigh, N.C. (Wade M. Smith, Douglas E. Kingsbery, J. Anthony Penry, Tharrington, Smith & Hargrove, Raleigh, N.C., on brief), for appellant.

Jean A. Benoy, Deputy Atty. Gen., Raleigh, N.C. (Barry McNeill, Asst. Atty. Gen., Raleigh, N.C., on brief), for appellees.

Before RUSSELL, MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

This is an appeal from a denial of federal *habeas corpus* relief under 28 U.S.C. § 2254 to a North Carolina state prisoner who has been convicted of three murders and sentenced to die.[1] The petitioner's execution is scheduled for Friday, January 13, 1984.

## I. FACTS

On May 31, 1979, the petitioner shot and killed three law enforcement officers in Rutherford County, North Carolina. That the petitioner killed the three officers is not in dispute.

The petitioner was arrested on June 1, 1979, the day following the killings. He was brought before a state district court, found indigent, and counsel, David K. Fox, was appointed to represent him. Ronald Blanchard served as co-counsel with Fox. The petitioner was subsequently indicted by a grand jury for murder with respect to each killing. Prior to trial, the petitioner's motion for a change of venue was allowed and his case was transferred for trial from Rutherford County to McDowell County, North Carolina.

The trial court had denied counsel's request upon appointment that it allow fees for expert psychiatric evaluation of the petitioner. In June of 1979, counsel, at their own expense, promptly retained a psychiatrist, Dr. Codgen, to examine petitioner. "Several weeks" later petitioner's attorneys discovered that Codgen was undergoing domestic difficulties and would be unable to evaluate the petitioner. Counsel then, in early August of 1979, engaged the services of another psychiatrist, Dr. George W. Doss. The state contested counsel's motions to obtain an order allowing Doss to examine Hutchins. There was a one week's delay in the trial court's hearing and granting of the motions. Doss' schedule led to other delays

so that Doss was not able to meet with Hutchins until August 28, 1979. Doss prepared a preliminary report and it was received by Hutchins' lawyers on September 6, 1979. Doss stated in the preliminary report that he did not have enough information to be sure, but he felt that Hutchins was suffering from a "paranoid delusional system."

Hutchins was convinced that his lead counsel, Fox, was in collusion with the state on account of Fox's previous employment as an assistant district attorney. Hutchins, on August 16, 1979, requested that his lawyer be discharged. Fox filed a motion requesting that he be allowed to withdraw on the ground that "no meaningful communication" was possible between him and Hutchins. The trial court, with Hutchins' consent, conducted a closed hearing on September 5–6, 1979, to consider the motion. Even though another attorney had volunteered to take the case, the trial court refused to allow counsel to withdraw.

At the September 6, 1979 hearing, counsel informed the state that it was possible Hutchins would raise an insanity defense. The state requested that Hutchins be immediately transferred to the Dorothea Dix Hospital in Raleigh, 210 miles from the place of trial, for evaluation. Hutchins' lawyers did not expect this; however, they did not object to the transfer. The state's request was granted and Hutchins was transferred that same day, September 6, 1979. Counsel Blanchard flew to Raleigh and visited Hutchins once during his stay at Dorothea Dix. Hutchins was not returned from Raleigh until September 14, 1979. Hutchins then refused to cooperate with Dr. Doss, the psychiatrist hired by counsel, when Doss tried to examine him on September 16, 1979. Counsel asked the trial court for a continuance on the first day of trial, September 17, 1979.

Counsel supported its motion for a continuance with the contention that they were unprepared. Unpreparedness supposedly

---

[1]. The petitioner was convicted of first degree murder for the killing of two law enforcement officers. He was sentenced to die for each of the first degree murders. The petitioner was also convicted of second degree murder for the killing of a third law enforcement officer. He was sentenced to life imprisonment for the second degree murder.

stemmed from two sources: 1) the inability to develop a defense based on insanity; 2) the state's decision to change its theory in two of the killings from premeditation and deliberation to lying in wait. The court questioned counsel about when the trial date of September 17, 1979 had been set. Fox, appearing for Hutchins, said that he knew the state was going to ask for a trial date of September 17, 1979 in early June of that year. The record does not disclose the trial judge's reasons for denial of the motion for a continuance. From the interchange in the trial transcript, however, it can be inferred from the direction of the trial judge's questions that he felt that counsel had adequate time to prepare.

The trial commenced immediately after the denial of counsel's motion for a continuance. Hutchins did not testify at trial; counsel presented no evidence to support the petitioner's only possible defense, insanity. On September 21, 1979, the jury returned verdicts finding the petitioner guilty of first degree murder of two officers and the second degree murder of a third officer. On September 22, 1979, following a sentencing hearing, the jury returned recommendations that the petitioner be punished by death for each of the first degree murders. On that same day, the trial court entered judgments sentencing the petitioner to life imprisonment for the second degree murder and death for each of the two first degree murders.

The North Carolina Supreme Court found no error in the lower court proceedings and affirmed the petitioner's convictions and sentences. *State v. Hutchins,* 303 N.C. 321, 279 S.E.2d 788 (1981).

The petitioner filed a Motion for Appropriate Relief in Rutherford County Superior Court. His motion was denied. The North Carolina Supreme Court denied the petitioner's Writ of Certiorari. A North Carolina superior court then set October 15, 1982

as the time for the execution of the petitioner's death sentences.

On September 24, 1982, Hutchins filed a petition for a writ of *habeas corpus* and an application for a stay of execution in the United States District Court for the Eastern District of North Carolina. All of the claims raised in the prisoner's federal *habeas* petition had been exhausted in the North Carolina courts. The federal district court on September 30, 1982 stayed the petitioner's execution.

On December 7, 1982, the petitioner's cause was transferred to the United States District Court for the Western District. Following an evidentiary hearing, the United States District Court for the Western District of North Carolina on July 29, 1983 denied and dismissed the petition for *habeas corpus* and dissolved the stay of execution entered by the United States District Court for the Eastern District of North Carolina. Wade M. Smith and Roger W. Smith, who have represented Hutchins for no less than 4 years, that is, presumably, in all proceedings since the trial and conviction in September, 1979, appeared in the federal *habeas corpus* proceedings.

The petitioner filed in the United States District Court for the Western District of North Carolina a timely notice of appeal to this Court, an application for a stay of execution, and application for a certificate of probable cause to appeal. On September 1, 1983, the district court denied the petitioner's applications.

On October 11, 1983, the petitioner filed an application for a certificate of probable cause and an application for a stay of execution in this Court. We allowed the application for a certificate of probable cause but denied the application for a stay, electing instead to hear the appeal on an expedited basis. Argument took place on December 6, 1983.[2] Our decision will have been

**2.** We ordered that the petitioner's brief be filed by November 25, 1983, that the respondent's brief be filed by December 2, 1983 and that the case be set for oral argument on December 6, 1983. Although the schedule is shorter than customarily is the case, it was sufficiently long for the parties to file well researched briefs and supporting records. We are satisfied that we have had sufficient time to study and research the issues in the case before reaching our decision.

taken and the parties informed of it sufficiently before January 13, 1984, the date for which execution has been scheduled, to make inappropriate a grant of the requested stay.

## II

The review of a death sentence and the conviction upon which it rests is by definition difficult and demanding. It imposes on judges the severest of the tasks assigned to them. "[D]eath is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (Stevens, J., joined by Stewart and Powell, JJ.). The death penalty raises strong feelings in almost everyone. The members of this Court each hold serious, though perhaps not identical, views about the wisdom and the morality of capital punishment. "Our individual preferences, however, are not the constitutional standard." *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). It is clear that the states may constitutionally impose death sentences so long as the requirements of due process are met. *See Gregg v. Georgia,* 428 U.S. 153, 169, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). Only two Supreme Court justices maintain that capital punishment is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. *Sullivan v. Wainwright,* —— U.S. —— at ——, 104 S.Ct. 450 at 452, 78 L.Ed.2d 210 (1983) (Brennan, J., dissenting, joined by Marshall, J.).[3]

This is consequently an appeal on the merits of the prisoner's petition for a writ of *habeas corpus.* The petitioner has been afforded an opportunity to address the merits and our decision is on the merits. *Cf. Barefoot v. Estelle,* —— U.S. ——, ——, 103 S.Ct. 3383, 3395, 77 L.Ed.2d 1090 (1983) ("If an appeal is not frivolous, a court of appeals may still choose to expedite briefing and hearing the merits of all or of selected cases in which a stay of a death sentence has been requested, provided that counsel has adequate opportunity to address the merits and knows that he is expected to do so.").

Subsequent to oral argument, the appellees filed a motion for leave to file a supplemental appendix consisting of two exhibits and one

At the same time, notwithstanding the fact that the law constitutionally allows imposition of the punishment of death for the crime of murder in appropriate cases, individual sentences of death in specific cases have been unconstitutionally imposed. *See e.g., Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Mindful of the heightened scrutiny occasioned by the irrevocability of a death sentence once it has been carried out, and the increased concern brought about because error has occurred in other cases, we have carefully scrutinized all of the issues raised by the petitioner.

## III

The petitioner raises eight separate arguments as to why we should reverse the district court's denial of his petition for a writ of *habeas corpus.* We deal with each argument in the order it has been raised by the petitioner.

### A.

The petitioner claims that the district court denied him a full and fair evidentiary hearing. The district court would not allow the petitioner's lawyers to develop evidence that, prior to the date of the killings, there had been confrontations between the petitioner and Huskey, the first officer the petitioner killed. The district court admonished counsel to stick to the issue before the court, ineffective assistance of counsel, and threatened to stop the hearing if counsel did not do so. The petitioner claims that the district court's actions and demeanor intimidated counsel at the habeas hearing and constitute reversible error.

pretrial order referred to during the argument which had been entered or admitted at the criminal trial or at the *habeas corpus* evidentiary hearing. We hereby grant the appellees' motion and include the exhibits in the record on appeal.

3. We are acutely aware that scholars continue to debate whether capital punishment is constitutional. *See, e.g.,* R. Berger, *Death Penalties: The Supreme Court's Obstacle Course* (1982); H. Bedau, *The Death Penalty in America* (3d ed. 1982). We are not, however, free to address, on the basis of our own beliefs or preferences that question. Rather it is the interpretation by a majority of the Supreme Court of the Constitution that controls.

■ The information counsel sought to present was irrelevant to the petitioner's claims. The petitioner's only viable trial defense was insanity. The fact that the petitioner had earlier had unrelated confrontations with a victim was not itself asserted on appeal or in prior *habeas* proceedings to have contributed to the creation of constitutional error. It has no bearing on trial counsel's relations with the petitioner, the reasons for the trial court's refusal to grant a continuance, trial counsel's preparedness, or any other issue raised in the *habeas* petition. The district court did not err when it refused to allow irrelevant evidence to be developed.

The petitioner's brief and his counsel's argument before this Court both stress that the district judge's demeanor intimidated counsel. Just because a judge does not let counsel have his way and resists counsel's repeated attempts to overrule the judge in his own courtroom, does not mean that a judge is intimidating. As in life, in a courtroom a lawyer wins some, and loses some. Petitioner's counsel at the district court level and before this Court is an experienced criminal lawyer. We need not, and do not, accept that he was intimidated by a judge's bark. We rather believe that "intimidation" is here a valiant, if farfetched, argument designed to insure that no stone is left unturned in a noble effort to assist a client in every possible way.

#### B.

The petitioner claims that his right to counsel, which is guaranteed by the Sixth Amendment to the United States Constitution, was denied because the trial court refused his request that assigned trial counsel be discharged, which request was augmented by trial counsels' motion that they be allowed to withdraw. The gravamen of the petitioner's claim is that there was a lack of meaningful communication between assigned counsel and himself.

■ Many lower federal courts have said that lack of effective communication between counsel and a criminal defendant amounts to ineffective assistance of counsel. *See, e.g., Linton v. Perini,* 656 F.2d 207, 212 (6th Cir.1981) ("Basic trust between counsel and defendant is the cornerstone of the adversary system and effective assistance of counsel."); *United States v. Williams,* 594 F.2d 1258 (9th Cir.1979). Last term, however, the Supreme Court rejected the Ninth Circuit's assertion that the Sixth Amendment guarantees a "meaningful relationship" between an accused and his counsel. *Morris v. Slappy,* —— U.S. ——, ——, 103 S.Ct. 1610, 1610, 75 L.Ed.2d 610 (1983). The accused in *Morris* refused to cooperate or even to speak to counsel, an assistant public defender who was substituting for a colleague who became ill before trial. Even if the holdings of the lower federal court cases survive *Morris,* we do not believe that, in the case before us, the petitioner was denied assistance of counsel because of a lack of effective communication. The asserted basis for Hutchins' distrust, namely, prior service by Fox as an assistant district attorney may have been genuine. At the same time it was and is inescapably farfetched. The experience would be expected to increase Fox' capabilities. Lawyers regularly turn to defense work after having served as prosecutors, without evidencing the least inclination to pull punches because of the prior experience "at the other table."

One also cannot ignore that, in the particular case of Hutchins, delay for whatever reason was almost certainly to his advantage. The fact of the killings and the further fact that they were premeditated or committed while lying in wait were almost certain to be proved. The effort to develop evidence to establish even the *prima facie* case necessary to bring insanity before the jury as a defense were meeting with little success. *See United States v. Marable,* 657 F.2d 75, 76 (4th Cir.1981) ("some evidence" must be introduced to weaken the presumption that a criminal defendant is sane).

Although the petitioner's relations with counsel Fox may have been strained from the start, there is no evidence that petitioner had communication problems with co-counsel Blanchard until trial. The petition-

er has not suggested any defect in trial counsels' performance that was the result of their supposed inability to communicate. Even if there was no effective communication, the petitioner has not made any showing of even the possibility of prejudice, a prerequisite for a grant of *habeas* based on ineffective assistance of counsel.[4]

### C.

The petitioner claims that his right to a public trial was denied when the trial court considered his motion to dismiss counsel and counsel's motion to withdraw in a closed hearing.[5] Both counsel and the petitioner requested that the hearing be held in the judge's chambers. The trial judge questioned the petitioner about this. The judge's final question before the hearing was transferred from the courtroom to chambers was:

> With regard to a closed court, Mr. Hutchins, do you waive all the provisions of both the State and Federal Constitutions that require courts to be open and public?

The petitioner responded, "Yes sir."

The petitioner raises two separate claims with respect to his asserted right to a trial held fully in public. First, he claims that his Sixth Amendment right to a public trial

was denied by the closing of the hearing. Second, he claims that the First Amendment right of the public and press to attend the hearing was denied and that he has standing to raise their claim.

■ The petitioner's right to a public trial was not denied. A criminal defendant can waive his right to an open trial.[6] *See Singer v. United States,* 380 U.S. 24, 35, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965). Of course, a waiver of a constitutional right is effective only if it is "an intentional relinquishment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Counsel Blanchard discussed the waiver with the petitioner. The trial court itself advised the petitioner of his right to an open hearing. We believe that the petitioner's assent to a closed hearing was knowing and intelligent. His waiver precludes our considering the merits of the Sixth Amendment issue.[7]

■ The petitioner's attempt to overturn his conviction on the ground that the public and press had a First Amendment right to attend the closed hearing must fail for at least two reasons: First, the petitioner cannot rely on the rights of third parties. Second, those third parties do not have a right on the facts of this case.[8]

---

**4.** The courts of appeal are in disagreement as to the type of prejudice that a criminal defendant must show in order successfully to attack a conviction. *Compare United States v. Decoster,* 624 F.2d 196, 206 (D.C.Cir.1976) (likelihood of prejudice), *with Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983) (actual prejudice). We have deferred deciding the very issue until after the Supreme Court decides *Strickland. See Kelly v. Warden, House of Correction,* 701 F.2d 311 (4th Cir.1983). However, we are sure that a person claiming ineffective assistance of counsel must show some type of prejudice. The petitioner in this case has utterly failed to do so.

**5.** A court reporter was present throughout the entire closed hearing. The reporter's transcript is in the record.

**6.** Pretrial proceedings, such as the hearing relating to dismissal or withdrawal of counsel in the petitioner's case, have not traditionally

been as open as trials, themselves. *Gannett Co. v. DePasquale,* 443 U.S. 368, 387, 99 S.Ct. 2898, 2909, 61 L.Ed.2d 608 (1979). *Gannett* implies that a criminal defendant may waive any right he may have to an open hearing.

**7.** We note that the petitioner claims that the hearing was closed in order to intimidate him to be happy with his counsel. The record indicates that counsel's motive was to avoid damaging pretrial publicity. The case was newsworthy. It had already been transferred from one county to another to guard against the potential ill effect of publicity. The transcript shows that, regardless of suspicions or concerns felt personally by the petitioner, the petitioner simply was not intimidated in the closed hearing.

**8.** The petitioner's third party claim may also be moot. The hearing has already been held and a transcript of it is available for public inspection. See, however, *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973)

■ A person cannot normally rely on the rights of third parties to defend himself or to bring an issue before a federal court. *See McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). The Supreme Court has, it is true, allowed third parties to invoke the rights of others who were not in a position to assert them for themselves. *See NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Nevertheless, as they have abundantly proved in like situations, the news media have both the resources and the ability to vindicate their and the public's rights of access to court proceedings. They have not been reluctant to do so.

■ Even assuming, *arguendo,* that the petitioner can rely on the First Amendment rights of third parties, his claim must still fail. The Supreme Court has clearly held that a court may close a pretrial hearing to the public to protect a defendant's right to a fair trial. *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). The *Gannett* Court noted that there was no objection to closure by any of the members of the public present when the pretrial hearing was closed. 443 U.S. at 392, 99 S.Ct. at 2911. The record in the present case does not reveal a contemporaneous objection. The *Gannett* Court also noted that the trial judge assessed the possible prejudice that the defendants would face if an open hearing were held. 443 U.S. at 392–93, 99 S.Ct. at 2911–12. The trial judge did not make such an explicit assessment in the present case. However, petitioner's counsel said that the reason for asking for a closed hearing was to avoid prejudicial pretrial publicity. The trial court also noted that prior hearings in the case which had been heard by another judge had been closed. We infer from the record that the trial judge's closure of the hearing was motivated by the same reasons that motivated the trial judge in *Gannett.* Therefore, we believe that third parties could not have mounted a successful challenge to the closing.

(injury is "capable of repetition, yet evading review" because of its short duration). *See*

### D.

The petitioner claims that he was denied effective assistance of counsel because his counsel was unprepared and the trial court refused to grant a continuance. On the day of trial, September 17, 1979, petitioner's attorneys moved for a continuance because they were not prepared. The motion was denied. At trial, petitioner's attorneys offered no evidence. The petitioner claims that he was denied effective assistance of counsel because his attorneys did not have adequate time to prepare his only viable defense, insanity, and the trial court's denial of a continuance was an unconstitutional abuse of discretion.

The North Carolina Supreme Court justified its refusal to overturn the conviction because of the refusal of a continuance on the grounds that counsel did not object to Hutchins' transfer to Raleigh and the trial court did not instruct the jury on theories of lying in wait. *See State v. Hutchins,* 303 N.C. 321, 343, 279 S.E.2d 788, 802 (1981).

■ The Supreme Court has repeatedly made clear that the granting of a continuance is within the trial judge's discretion. *See Morris v. Slappy,* —— U.S. ——, ——, 103 S.Ct. 1610, 1615, 75 L.Ed.2d 610 (1983); *Ungar v. Sarafite,* 376 U.S. 575, 589–90, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921 (1964); *Avery v. Alabama,* 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940). In *Ungar,* the Court said:

> There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

376 U.S. at 589, 84 S.Ct. at 849.

We have located no case where the Supreme Court has overturned a conviction because of refusal to grant a continuance. In *Avery v. Alabama,* 308 U.S. 444, 60 S.Ct.

*also Gannett Co. v. DePasquale,* 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979).

321, 84 L.Ed. 377 (1940), the Court said a denial of a continuance was not unconstitutional where a man was indicted on March 21, 1938, for a 1932 murder and trial was held on March 24, 1938. Avery had been uncooperative with his attorneys; none of the people in the community or Avery's relatives could offer information helpful to the defense. Avery was tried, convicted of murder and sentenced to death. The Court justified its decision on the grounds that the trial was in a rural community where counsel could discover information quickly and there was no indication in the record that counsel could have done more had additional time been granted. In *Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), the Court said denial of a continuance was not unconstitutional where the petitioner had been notified of a Tuesday contempt hearing on the preceding Thursday but did not engage other counsel until Saturday. The Court held that there was not unconstitutionally inadequate time for preparation where the evidence was fresh, the witnesses and evidence readily available, and the hearing revolved about one statement made by Ungar during a recently completed trial. In *Morris v. Slappy,* —— U.S. ——, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), the Court said that a denial of a continuance was not unconstitutional where counsel was substituted six days before trial for counsel taken ill. The Court was influenced, in part, by counsel's statement to the trial court that he was ready for trial.[9] —— U.S. at ——, 103 S.Ct. at 1615.

The Fourth Circuit has, however, on three occasions overturned convictions because of a trial court's refusal to grant a continuance. Two of the cases are inapplicable to the present case. *United States v. Evans,* 569 F.2d 209 (4th Cir.1978), *cert. denied,* 435 U.S. 975, 98 S.Ct. 1624, 56 L.Ed.2d 69 (1979) (counsel appointed on Friday, trial on following Tuesday); *Shirley v. North Carolina,* 528 F.2d 819 (4th Cir.1975) (trial court refused continuance to allow defendant to procure testimony of a neces-

sary witness, state had already delayed trial 16 months, and state agreed to continuance).

The remaining case, *United States v. Walker,* 537 F.2d 1192 (4th Cir.1976), is much more similar, in its facts, to the instant case. Walker's attorney made a motion prior to trial for the appointment of a psychiatrist. The court appointed a psychiatrist; he examined Walker for less than thirty minutes a week before trial. Walker's counsel received the psychiatrist's report "a relatively short time before trial." The report said Walker was competent to stand trial but failed to state any conclusions as to Walker's mental capacity to commit the offense. Also, "shortly before trial" counsel learned of a mental examination of Walker made four years earlier at a hospital. The trial court refused counsel's motion for a continuance made on the morning of trial. No defense of insanity was made because counsel did not have sufficient information upon which to base such a defense. The Court held that Walker's right to a fair trial was violated because his counsel was deprived of an adequate opportunity to determine the existence of an insanity defense. 537 F.2d at 1194. The Court made that holding despite the fact that there was no indication during the trial that Walker may have been insane and the fact that Walker had no history of psychiatric disorders. The Court remanded the case to the district court with directions to appoint a psychiatrist to determine whether there existed a substantial question as to Walker's criminal responsibility. On the condition that such a question be proved to be present, the Court ordered a retrial. Otherwise, the judgment was to be affirmed. 537 F.2d at 1196.

*Walker* is distinguishable from the present case, however, in several significant respects. First, counsel for Hutchins was appointed over three months before trial and had a full opportunity to develop an insanity defense. In Walker's case, how-

9. *Cf. Sykes v. Virginia,* 364 F.2d 314 (4th Cir. 1966) (continuance denial upheld—irrelevant that lawyer said he was unprepared).

ever, the opinion is silent as to how long before trial counsel began to represent Walker. It is not unlikely that he had an insufficient period of time in which to develop the possibility of an insanity defense. *Cf. United States v. Sellers,* 658 F.2d 230, 231 (4th Cir.1981) (no need for continuance where *pro se* defendant had over three months to prepare for trial even though prison restrictions and conditions imposed on him may have made trial preparation difficult). Second, the psychiatrist's report in Hutchins' case was received eleven days before trial. In Walker's case, the interval was described imprecisely as "relatively short" but was certainly less than one week. Third, but by no means least, an attempt by the psychiatrist to examine Hutchins on the day before trial was frustrated by Hutchins himself. No parallel occurrence took place in Walker's case.

Fourth, even if the facts of this case were exactly like those of *Walker,* it must be borne in mind that *Walker* involved a direct appeal within the federal system, not a *habeas corpus* case where we are asked to interfere with a considered state court judgment on the grounds that it was constitutionally defective. On the constitutional issue it is of imperative importance that the petitioner has not shown in any concrete way that he was prejudiced by the denial of the continuance. Even in a direct appeal situation, we, in a case subsequent to *Walker,* have held:

> We must be reluctant to find arbitrariness in the exercise of trial court discretion [to grant or deny a continuance] based upon no more than post-hoc asser-

tions by counsel that given more time something might have turned up.

*United States v. Badwan,* 624 F.2d 1228, 1231 (4th Cir.1980). We are especially reluctant to find such arbitrariness in a *habeas* review.[10]

The petitioner has not even shown the mere possibility of prejudice because his continuance was denied. The story as to the killings and the circumstances surrounding them was all too clear. Hence, insanity remained the one last hope for the accused. The psychological report on the petitioner compiled at Dorothea Dix Hospital in September 1979 stated: "at the time in question, Mr. Hutchins was aware of the nature and quality of his actions and the difference in right and wrong."[11] Dr. Doss, the psychiatrist hired by petitioner's counsel, testified at the *habeas* hearing in the district court that although he felt that the Dorothea Dix report was incomplete he agreed with it. Doss also testified that he would not have been able to examine the petitioner properly until he had established a relationship with Hutchins. Doss said it may have taken weeks or more to establish such a relationship. Or, it may never have been established. Four years have passed since trial. No effort has been made during that interval to determine whether the petitioner did not have the requisite mental state to commit the crimes of which he stands convicted.

The petitioner also raises the argument that he would not have been sentenced to die, even if he had been convicted of murder, if the continuance had been granted

---

**10.** Reluctance can, of course, be overcome in an appropriate case. *See Shirley v. North Carolina,* 528 F.2d 819 (4th Cir.1975). *See also Lee v. Winston,* 717 F.2d 888 (4th Cir.1983). In *Lee* we ruled that a federal court was not bound in a 42 U.S.C. § 1983 action by a prior state court ruling adverse to a person's claim of right where the state court arbitrarily and unfairly denied the person a continuance, resulting in prejudice. Lee's counsel was informed of changed medical circumstances, which were the center of a previously denied motion, on October 18, 1982. The following day counsel moved for a rehearing and the state court ordered that the hearing on the motion be held

two days hence. When the appointed day arrived, counsel asked for a continuance because he had not been able, despite diligent effort, to obtain an independent review of the medical record. Counsel's request was denied. Counsel in the present case were aware of the petitioner's potential insanity defense from the day they accepted the case and the psychiatrist's report on the petitioner was received eleven days before trial.

**11.** North Carolina follows the rule of *M'Naghten's Case,* 8 Eng.Rep. 718 (1843) on the test to be applied for the defense of insanity.

and his counsel had been able to develop mitigating psychological evidence. Dr. Doss did testify during petitioner's sentencing hearing.[12] The jury found that the petitioner was suffering from emotional disturbance at the time of the murders. However, the jury also found that the mitigating factor so established was outweighed by three aggravating factors present.[13] The petitioner has simply not demonstrated in any way whatsoever that the jury would have given greater weight to his emotional disturbance if he had been granted a continuance.

Were we sitting in the trial judge's place on September 17, 1979, we perhaps would have granted a continuance. However, trial court *discretion* would mean nothing if we were to grant *habeas* relief simply because our view differs from the trial court's view. Factors were here present permitting a decision either way. The present case is in some respects reminiscent of *United States v. MacDonald,* 688 F.2d 224, 236 (4th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983) ("For all those considerations, my view is that the testimony should have been admitted. But it would read out of the law the concept of trial court discretion were courts of appeals to label as 'abuse of discretion' any action by a district court with which the appellate court disagrees. Accordingly, I do not regard it proper to dissent." Murnaghan, J., concurring).

### E.

The petitioner claims that the imposition of the death penalty in this case is a violation of the Eighth Amendment's prohibition of cruel and unusual punishment because the jury found that the petitioner was suffering from emotional disturbance at the time of the murders. The petitioner presented testimony from Dr. Doss during the sentencing hearing. Doss testified that the petitioner was suffering from paranoid psychosis. The jury found, as a mitigating factor, that Hutchins was suffering from emotional disturbance at the time of the murders. However, the jury also found this mitigating factor was outweighed by three aggravating factors—the murders were committed for the purpose of avoiding arrest, were committed against law enforcement officers while engaged in official duties and were part of a course of conduct including violence against other persons.

The petitioner argues that the jury's finding coupled with Dr. Doss' testimony shows that the petitioner did not possess the level of *mens rea* necessary to allow a constitutionally permissible imposition of the death penalty. The petitioner did not contend at trial that he lacked the requisite mental state to be convicted of murder. And, we have found that no error infects the petitioner's murder conviction. Petitioner is arguing, in essence, that a different, increased *mens rea* is required for imposition of the death penalty than for the conviction standing alone of first degree murder where the condemned person actually committed the killings. Petitioner cites no case that supports his proposition. Nor are we aware of any that do so.[14]

▮ The mere fact that the jury found that the petitioner committed the murders while suffering from emotional distress does not make the imposition of death un-

---

**12.** His testimony, however, is not preserved in the record.

**13.** The crimes were committed a) to avoid arrest, b) against law enforcement officers on duty and c) involved violence against others.

**14.** The petitioner does cite *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) to support his proposition. *Enmund* held that the Eighth Amendment does not permit "imposition of the death penalty on a person who aids and abets a felony in the course

of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. at 797, 102 S.Ct. at 3376–77, 73 L.Ed.2d at 1151–52. Enmund was an accomplice in a robbery. While he was in a car, Enmund's co-participants robbed and killed an elderly couple. The Court said: "[Enmund's] punishment must be tailored to his personal responsibility and moral guilt." 458 U.S. at 801, 102 S.Ct. at 3378, 73 L.Ed.2d at 1154. We do not interpret *Enmund* to require any special *mens rea* for the imposi-

**1436**

constitutional. In the wake of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Georgia passed a death statute that required a jury to weigh mitigating and aggravating factors before imposing a death sentence. The Supreme Court found Georgia's statute to be constitutional in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). North Carolina, like many other states, after *Gregg,* passed statutes similar to Georgia's. North Carolina's statute envisions the jury's balancing of mitigating and aggravating factors. *See* N.C.Gen.Stat. § 15A–2000. The jury in Hutchins' case weighed the factors and found that the aggravating factors favoring death outweighed the mitigating factors disfavoring death. It is not our job to usurp the jury's function by putting our thumb on one side of the scale or the other. *See Eddings v. Oklahoma,* 455 U.S. 104, 117, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982).[15]

**F.**

The petitioner claims that he was denied effective assistance of counsel, which is guaranteed by the Sixth Amendment, because trial counsel did not permit him to testify and failed to interview witnesses. The petitioner's claims that counsel did not visit him enough and did not interview witnesses are groundless. The record shows that counsel spent literally hundreds of hours preparing for trial. Counsel interviewed every potential witness named by the petitioner except for a person who could not be located.

■ Petitioner claims Fox, his lead counsel, threatened to withdraw from the case if he testified. Fox denies the threat. Fox did not want the petitioner to testify because Fox feared that the state would bring up the petitioner's prior voluntary manslaughter conviction and two convictions of assault by pointing a gun. The district court found Fox's testimony to be credible and concluded that counsel did not coerce or exert undue pressure on the petitioner not to testify. The district court's finding is supported by the record; it is not clearly erroneous. *See* Fed.R.Civ.P. 52(a) ("Findings of fact shall not be set aside unless clearly erroneous. . . .").

■ Counsel's advice not to testify is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance. *See Marzullo v. Maryland,* 561 F.2d 540, 544–45 (4th Cir. 1977).

**G.**

■ The petitioner claims that the trial court erred because it failed to tell the jury that it could consider the defendant's clean criminal record as a mitigating factor at the sentencing hearing.

"[N]o significant history of prior criminal activity" is an enumerated mitigating factor in North Carolina's death statute. N.C. Gen.Stat. § 15A–2000(F)(1). Neither party requested that the trial court specifically mention the consideration to the jury; the trial court did not mention it. The record in no way supports a conclusion that the petitioner was prevented from presenting mitigating evidence of this sort. *Cf. Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (trial judge cannot

---

tion of death on a person who actually committed a killing and was convicted of first degree murder. Hutchins, in stark contrast to Enmund, specifically intended, and accomplished, the deaths of the victims.

**15.** Although no Supreme Court case expressly deals with the issue of whether it is unconstitutional to execute a person who was operating under emotional distress, several cases imply that such a person may legally be executed. *See, e.g., Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 876, 71 L.Ed.2d 1 (1982) ("In

some cases, such evidence [of a difficult family history and of emotional disturbance] properly may be given little weight."); *Richmond v. Arizona,* 434 U.S. 1323, 1325, 98 S.Ct. 8, 9, 54 L.Ed.2d 34 (1977) (Rehnquist, Circuit Justice) (denied stay of execution where "[t]he only mitigating ground apparently suggested by applicant before the Arizona courts was psychological testimony characterizing applicant as a sociopath.").

Indeed, in common parlance, it is fair to say that every, or nearly every, murderer was to some extent emotionally disturbed.

refuse to consider certain types of mitigating evidence); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (state statute cannot limit types of mitigating evidence cognizable by sentencer). If any error was made, it was an error of state law which is not cognizable by a federal court. *See Barfield v. Harris,* 719 F.2d 58 (4th Cir.1983).[16]

### H.

The petitioner's final claim is that he was not permitted to offer full and complete evidence of his good character during his sentencing hearing. The trial court sustained several objections to the testimony of the petitioner's character witnesses when they strayed from community reputation to personal opinion or individual incidents.

"Normally, the admissibility of evidence ... in state trials [is a matter] of state law and procedure not involving federal constitutional issues." *Grundler v. North Carolina,* 283 F.2d 798, 802 (4th Cir.1960), *cert. denied,* 362 U.S. 917, 80 S.Ct. 670, 4 L.Ed.2d 738 (1960). However, the Supreme Court has been very sensitive to any impediment to the consideration of any *type* of mitigating evidence in a death sentencing hearing. *See Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 608, 98 S.Ct. 2954, 2966, 57 L.Ed.2d 973 (1978). The Eleventh Circuit has considered those opinions very carefully and concluded:

> These cases establish that, subject only to the loose evidentiary requirement of relevance, capital defendants have a right to offer any evidence they choose on character or record or circumstances of the offense.

*Stanley v. Zant,* 697 F.2d 955, 960 (11th Cir.1983).

 We have carefully examined the transcript of the character witnesses' testimony. It appears to us that the trial court only sustained evidentiary objections to the testimony when witnesses roamed away from the subject before the court—the petitioner's character. The petitioner has not shown how the excluded testimony would have been relevant. If we held on the record before us that the trial court's rulings were unconstitutional, we would, in effect, be saying that no rules of evidence can constitutionally be applied to a defendant's case during a capital sentencing hearing. We find no indication that *Eddings* and *Lockett* preempt all state rules of evidence. Both cases speak about *types* of evidence, not evidentiary rules. *Stanley's* dictum, which we believe interprets *Eddings* and *Lockett* very broadly, nevertheless supports our belief that a trial court may, and perhaps should, exclude irrelevant testimony during a death sentencing hearing. Thus, we hold that the trial court's evidentiary rulings were not unconstitutional.

## IV

Thus we have concluded that merit has not been shown to exist in any of the claims advanced by the petitioner. Nevertheless, we have given each claim careful consideration because of the special gravity of the punishment the petitioner is to receive. Unfortunately for the petitioner, there is no constitutional error present in this case.

The district court's denial of a writ of *habeas corpus* is affirmed. The mandate of this Court shall issue forthwith.

---

**16.** We note that Hutchins was convicted of manslaughter in 1955 and of two assaults at undeterminable dates. Whether evidence of those convictions would have been barred by North Carolina law to undercut a "no significant history of prior criminal activity" assertion by Hutchins is not mentioned by counsel. The fact that the petitioner has in fact been convicted of crimes in the past is hence to be treated as irrelevant to our holding on the issue and has been disregarded by us in concluding that no constitutionally significant error occurred.